709 A.2d 271

# IN THE MATTER OF THE ADOPTION
# OF CHILDREN BY G.P.B., JR.

Superior Court of New Jersey
Appellate Division

Submitted December 17, 1997—Decided May 5, 1998.

Before Judges MUIR, Jr., KESTIN and CUFF.

*David A. Stefankiewicz*, attorney for appellant M.M.

*Richard A. Russell*, attorney for respondent G.P.B., Jr.

The opinion of the court was delivered by

CUFF, J.A.D.

This is a contested adoption of two boys, now aged ten and eight, by their stepfather. The boys' birth father, M.M., appeals from an order terminating his parental rights and allowing the adoption by the stepfather. In this case, we must determine whether the facts as found by the trial judge satisfy the statutory criteria of *N.J.S.A.* 9:3–46, which governs adoption over the objection of the birth parent. We reverse.

M.M. and A.B. married in 1981. Several months after their marriage, A.B. realized that M.M.'s alcohol consumption was excessive. They separated and reconciled only after M.M. promised to stop drinking and participate in Alcoholics Anonymous. In 1987, A.B. became pregnant with the couple's first child, R.M. During this pregnancy, M.M. started to drink and to drink to excess. M.M. worked with a counsellor; however, during A.B.'s

pregnancy with their second child in 1989, M.M. resumed abusing alcohol.

The problem intensified after the birth of the second child, A.M. At times, M.M. did not come home. When he was home he could not hold a conversation. He lost fifty pounds, and the family's financial foundation was severely compromised by M.M.'s improvident expenditures and lack of attention to existing obligations. A.B. learned of this situation when she began to receive calls from creditors concerning unpaid and overdue bills. On one occasion, M.M. threatened to drive himself and his family into a tree. Finally, in spring 1990, when A.M. was only five months old, A.B. discovered M.M. holding the baby and trying to have the baby acknowledge that Jesus was his savior. The couple separated the next day.

The next two years were marked by several psychiatric hospitalizations for M.M., at least one of which led to an involuntary commitment. He was diagnosed with a bipolar disorder aggravated by substance abuse (alcohol and antihistamines). In February 1992, after one of his hospitalizations, the parties were divorced. The property settlement agreement granted sole custody of the children to A.B. M.M. agreed to pay $200 a week in child support and he agreed to have no visitation with the children. Prior to the divorce, M.M. saw the boys in a supervised setting. Since the divorce, A.B. has not allowed M.M. to see the children.

A.B. met G.B. in 1990. They started to date in 1991 and married in August 1994. Their daughter was born in 1995. A.B. and her husband testified that the boys consider G.B. as their father. They know that M.M. is their birth father but they have no relationship with him. G.B. is fully involved in the boys' lives. He serves as the soccer coach for one boy's team and the assistant coach for the other boy's baseball team. Both boys want to be known by G.B.'s last name. One of the boys cannot spell his birth surname. The older child has some recollection of his father; the younger child has none.

The medical testimony reveals that M.M.'s psychiatric condition is now stabilized. He no longer has bouts of manic behavior which in the past created such emotional and financial havoc. He continues to abstain from alcohol. There have been no episodes of delusional behavior. Two recent hospitalizations in 1995 and 1996 were required solely to adjust his medications.

In 1992, M.M. was declared disabled by the Social Security Administration. He receives a monthly stipend of $892. His children by his marriage to A.B. each receive monthly stipends of $93. At one time, due to his disability and multiple hospitalizations, M.M. accrued substantial child support arrears. These arrears have been satisfied and A.B. received a $5500 lump sum payment on behalf of the boys when M.M. was declared disabled.

M.M. has remarried. He resides with his wife and her four children from her prior marriage and the two children born during this marriage. M.M. is also attending college full-time and was close to completion of degree requirements at the time of trial.

M.M. has not seen his children since M.M.'s psychiatric condition stabilized. A.B. will not allow visitation. M.M. has, however, filed repeated motions for visitation which A.B. has opposed. Each of his motions has been denied.

Following a three-day trial, the trial judge concluded that if "the children fail to perceive their father as their parent and should this circumstance exist for more than six months parental rights may be terminated." The trial judge also noted that such proof must be by clear and convincing evidence and that the subsequent adoption must be in the best interests of the children. He then found that no relationship exists between M.M. and his sons and that M.M. was able to substantially perform the regular and expected parental functions of care and support since mid–1993. He further found that the adoption by G.B. was in the best interests of the children.

A birth parent's right "to enjoy a relationship with his or her child is fundamental and constitutionally protected." *In re*

*Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 480, 641 *A.*2d 235, *cert. denied,* 513 *U.S.* 967, 115 *S.Ct.* 433, 130 *L. Ed.*2d 345 (1994). The right to conceive and raise one's child is deemed essential and is far more significant than a property right. *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986). Therefore, any inquiry regarding the termination of parental rights must be analyzed in light of the very strong protections that are afforded to those rights. *D.M.H., supra.*

The termination of parental rights, unlike the loss of custody, permanently ends the relationship between the birth parent and his or her child. *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 132, 631 *A.*2d 928 (1993). "Termination of parental rights is an extraordinary judicial remedy which will be granted only after intensive consideration of parental misconduct and, if appropriate, the welfare of the child." *In re Adoption of Two Children by J.J.P.*, 175 *N.J.Super.* 420, 426, 419 *A.*2d 1135 (App. Div.1980). Clear and convincing evidence of the relevant statutory criteria must be demonstrated before a court will order the termination of parental rights. *A.W., supra,* 103 *N.J.* at 612, 512 *A.*2d 438.

An adoption, being immutable and permanent, is distinguishable from custody which is not permanent and can be altered based on changed circumstances. *In re Adoption of Children by D.*, 61 *N.J.* 89, 93, 293 *A.*2d 171 (1972). Usually, the consent of both birth parents is required before a court will issue a judgment of adoption. *J.J.P., supra,* 175 *N.J.Super.* at 427, 419 *A.*2d 1135. When an adoption is granted over the objection of a birth parent, that parent's parental rights and benefits are forever severed. *Ibid.* A court therefore must proceed with caution and circumspection when a birth parent refuses to consent to an adoption of his or her child. *Ibid.* Furthermore, the best interest of the child standard cannot be the basis for an adoption unless it is first concluded that the nonconsenting parent's parental rights should be terminated. *Ibid.*

Since 1977, the standards governing an adoption over the objection of a birth parent have been codified by the Legislature. Since its initial enactment, *N.J.S.A.* 9:3–46 has sought to provide a standard by which a court should approach this issue which has such serious ramifications for all of the persons affected by any order. In 1994, the statute was substantially amended in an effort to identify objective standards to evaluate the conduct of the birth parent. *See In re Adoption of a Child by W.P.*, 308 *N.J.Super.* 376, 383–84, 706 *A.*2d 198 (App.Div.1998); *In re Adoption of a Child by F.O.*, 307 *N.J.Super.* 176, 184, 704 *A.*2d 604 (Ch.Div. 1997).

In its current form, *N.J.S.A.* 9:3–46 reads in part:

Objection by parent; prohibition of judgment of adoption; exception; guardian or person standing in loco parentis; notice and standing to object

a.    ... A judgment of adoption shall not be entered over an objection of a parent communicated to the court by personal appearance or by letter unless the court finds:

(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or

(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.

The regular and expected functions of care and support of a child shall include the following:

(a) the maintenance of a relationship with the child such that the child perceives the person as his parent;

(b) communicating with the child or person having legal custody of the child and visiting the child unless visitation is impossible because of the parent's confinement in an institution, or unless prevented from so doing by the custodial parent or other custodian of the child or a social service agency over the birth parent's objection; or

(c) providing financial support for the child unless prevented from doing so by the custodial parent or other custodian of the child or a social service agency.

A parent shall be presumed to have failed to perform the regular and expected parental functions of care and support of the child if the court finds that the situation set forth in paragraph (1) or (2) has occurred for six or more months.

The amendments reduce a court's discretion in determining what amounts to "regular and expected parental functions of care and support" by listing three factors to be considered and by establishing a six month presumptive time period. *W.P., supra;*

In re Adoption of a Child by R.K., 303 N.J.Super. 182, 193, 696 A.2d 116 (Ch.Div.1997). Furthermore, the amended version of the statute no longer includes the vague requirement of the "maintenance of an emotional relationship with the child" and replaces it with clearer and more objective language. R.K., supra, 303 N.J.Super. at 193–94, 696 A.2d 116. The statute does not, however, alter the significant concerns which must be considered when determining whether parental rights should be terminated. Id. at 194, 696 A.2d 116.

In W.P., we rejected the notion that parental rights cannot be terminated if the objecting parent is able to perform any one of the three "regular and expected functions of care and support of the child." We noted that the statute cites these functions in the disjunctive. We also noted that the Legislature did not mean that the three listed functions were all-inclusive. W.P., supra, 308 N.J.Super. at 384–85, 706 A.2d 198. Rather, we viewed the list provided by the Legislature as an attempt to identify the core values of parenthood. Id. at 385, 706 A.2d 198. Conversely, we observed that a parent's inability to perform any one core function, standing alone, should not be the basis for termination of parental rights. Ibid. Moreover, we rejected the notion that the Legislature intended to compel automatic severance of parental ties if the parent cannot perform one or more of the parental obligations for the stated time period. Id. at 386, 706 A.2d 198. Rather, we concluded that the standards provided by the Legislature must be considered within the context of "whether continuation of the parental relationship would place the child in imminent danger of serious harm." Ibid. The harm to the children may be physical or emotional.*

---

* We, too, disagree with the trial judge's suggestion in R.K. and conclusion in F.O. that the overall effect of the amendments is that the trial "court need only weigh the statutory criteria and need not inquire into whether the parent possessed the actual intent to abandon or neglect." In re the Guardianship of D.M.H., 309 N.J.Super. 179, 202, 706 A.2d 1129, 1142 (App.Div.1998) (quoting F.O., supra ).

Measured against this standard, in *W.P.* we affirmed the trial judge's conclusion that the continuation of the father's parental relationship with his daughter would place her in substantial jeopardy. The father was chronically addicted to drugs. He had spent a substantial part of his adult life in prison for crimes involving force and the use of weapons. Furthermore, his chronic untreated psychological condition made it unlikely that he could ever provide the emotional support, guidance and nurture required to establish and maintain a parental relationship with his daughter.

Similarly, in *R.K.* the trial judge allowed a stepparent adoption over the objection of the birth father where the father failed to make any support payments, canceled medical insurance for the child, saw the child twice over the span of almost seven years, and never pursued any legal remedies to obtain visitation with his daughter. *R.K., supra,* 303 *N.J.Super.* at 190, 696 *A.*2d 116.

A father's objection to the adoption of his son by long-term foster parents was rejected in *F.O., supra.* In *F.O.,* the child was placed with the foster parents when he was three weeks old. Within a month of being placed, the child's birth parents were arrested and served a term in federal prison on drug trafficking charges. Soon after the father's release from prison, he was reincarcerated in Florida for another ten months. The father never paid any child support. Although the child had spent time with his birth father, the visits were associated with visits between his foster parents and their daughter who had married the boy's birth father. The trial judge found that the birth father demonstrated no "commitment to parenthood" and "a general indifference toward his parental obligations." *Id.* at 185–86, 704 *A.*2d 604. Indeed, when faced with the prospect of the severance of his parental ties, he sought no more than vague and undefined visits with his son. *Id.* at 186, 704 *A.*2d 604. It was against this background that the trial judge described the father's participation in his son's life as "virtually nonexistent." *Ibid.*

Here, the trial judge found that M.M. was able to perform the regular and expected tasks of parenthood as of mid–1993. Implicit in this finding is a recognition that M.M.'s mental health precluded performance for a time of the regular and expected functions of parenthood and that his mental illness should not be used against him. We agree. This position is consistent with *P.F.R.* in which we held that the parent's conduct towards his child can only be measured from the time he learned that he had fathered a child. *In re Adoption of a Child by P.F.R.*, 308 *N.J.Super.* 250, 261–62, 705 *A.*2d 1233 (App.Div.1998); *see also F.O., supra,* 307 *N.J.Super.* at 185, 704 *A.*2d 604.

G.B. argues, and the trial judge found, that M.M. has no relationship with his children by A.B. This is true. However, according to G.B.'s argument and the trial judge's analysis, a birth parent's rights can be terminated regardless of the reason a child does not perceive the objecting parent as a parent. We cannot accept such a mechanistic application of the standards. To do so would reward the custodial parent who thwarts visitation and actively engages in conduct designed to denigrate the non-custodial parent or to minimize the role of that parent in the child's life. Yet, that is the inexorable result in any case in which the statutory standards are applied without reference to the facts of each case.

In this case, M.M. has provided financial support for his children. Initially, his estrangement from his children was the result of his mental illness which was exacerbated by alcohol abuse. That condition, however, has stabilized. Although he has been declared disabled, the mood swings and aberrant behavior associated with those mood swings have been controlled by medication. He abstains from alcohol. He is able to engage in a full-time college program. Significantly, he is able to perform the regular and expected parental functions for his four stepchildren and two children of his current marriage.

Moreover, unlike the fathers in *W.P., R.K.,* and *F.O.,* M.M. has repeatedly sought visitation with his sons. When thwarted by A.B., he sought a judicial remedy. He has continued to pursue a

relationship with his children, despite repeated denials by the court and opposition from his former wife.

We do not ascribe any evil motive to the mother. We do not minimize the havoc M.M.'s conduct created in the life of A.B. and their young sons. It is understandable that A.B. may want to keep that period in her past. It is also understandable that she wants to protect her sons from witnessing in the future the manic behavior which occurred in the past. However, this record does not demonstrate that M.M.'s mental state will deteriorate. In fact, this record demonstrates that M.M. lives in a supportive and informed environment which fosters his continued recovery. In sum, there is not only no record support for the proposition that M.M. has relinquished his parental role, but also there is no record support that the children are in any imminent risk of physical or emotional harm due to the continuation of the parental relationship. Accordingly, we reverse the order granting the stepfather's application to adopt the boys.

Reversed.