736 A.2d 1277

IN THE MATTER OF THE ADOPTION
OF CHILDREN BY G.P.B., JR.

Argued November 9, 1998—Decided August 3, 1999.

398

*Richard A. Russell*, for appellant, G.P.B., Jr.
*David A. Stefankiewicz*, for respondent, M.M.
The opinion of the Court was delivered by

POLLOCK, J.

This appeal concerns the standards for terminating the parental rights of a biological parent in an adoption proceeding. In this appeal, the stepfather of two minor children seeks to terminate the parental rights of the biological father and to adopt the children. The Family Part terminated the biological father's parental rights and approved the adoption. The Appellate Division reversed, finding that the biological father did not pose an imminent danger to the children. 311 *N.J.Super.* 38, 709 *A.*2d 271 (App.Div.1998). We granted the stepfather's petition for certification. 156 *N.J.* 405, 719 *A.*2d 637 (1998). During the pendency of the appeal, the Legislature amended the governing statute, *N.J.S.A.* 9:3–46, to emphasize that the dominant consideration was the best interest of children rather than the rights of their biological parents. We reverse the judgment of the Appellate Division and remand the matter to the Family Part for reconsideration under the amended statute.

I.

G.P.B. is the stepfather of two boys, R.M., age eleven, and A.M., age nine. The boys are the biological children of G.P.B.'s wife, A.B., and her former husband, M.M. The boys consider G.P.B. to be their father, and want to use his last name as theirs. G.P.B. wishes to adopt the boys. As part of the adoption proceeding, he

seeks termination of M.M.'s parental rights. M.M. objects to the adoption.

A.B. and M.M. were married in 1981. After several months, A.B. realized that M.M. was an alcoholic. At A.B.'s insistence, M.M. attended meetings of Alcoholics Anonymous. His condition stabilized, and M.M. and A.B. decided to have a child.

During A.B.'s pregnancy, however, M.M. again began to drink heavily. After the birth of R.M. on November 20, 1987, M.M. was so incapacitated that he could not care for his son. After consulting a drug-and-alcohol counselor, M.M. abstained from alcohol for a year. By 1989, however, M.M. had resumed his alcohol abuse. From the time A.M. was born on November 2, 1989, M.M. has not been involved in caring for his two sons.

In the spring of 1990, when A.M. was six months and R.M. was two and a half years old, A.B. and M.M. separated. M.M. became mentally ill and was involuntarily committed to a psychiatric hospital. He was diagnosed with bipolar disorder aggravated by alcohol and antihistamine abuse. Between 1990 and 1993, M.M. underwent several periods of psychiatric hospitalization.

Nonetheless, between 1990 and 1991, M.M. visited the boys weekly in a supervised setting. He also provided financial support for them. On Thanksgiving of 1991, however, M.M. appeared at A.B.'s home, told her that he was Jesus Christ, and that his place was with her. A.B. terminated his visitations with the children. M.M. has not seen or spoken with his children since that time.

In February 1992, A.B. and M.M. were divorced. As part of the divorce settlement, the Family Part granted A.B. sole custody of the children. In the separation agreement, M.M. surrendered all visitation rights, but agreed to pay $800 per month in child support. According to M.M., however, A.B. agreed orally to allow him supervised visitation.

Between 1992 and 1996, M.M. filed several motions for supervised visitation. A.B. opposed the motions, arguing that M.M. was not stable. M.M. declined to provide his medical records or other

proof that his condition had improved. The Family Part denied his motions.

During this period, M.M. failed to make the promised support payments. He limited his monthly payments to $186 from his $810 monthly Social Security disability benefits. More recently, M.M. appears to have paid all child-support arrears.

In addition, M.M. tried several times to communicate with the children. His mother called to ask if the children wished to speak with him. He sent them cards and small gifts. A.B. rebuffed his efforts.

In 1991, A.B. began dating G.P.B. They were married in 1994. During the course of their courtship, G.P.B. and A.B. primarily went with the boys on "family dates," such as picnics or trips to the zoo. Now, G.P.B. is substantially involved in the boys' lives as their father. He does the kinds of things that fathers do. He makes breakfast and prepares them for school, coaches R.M.'s soccer team, attends R.M.'s choir performances and A.M.'s violin recitals, helps the boys with school projects, and meets with their teachers. Functionally, he is their father.

To M.M.'s credit, since 1993 he has been a recovering alcoholic. His condition has stabilized, and he receives regular treatment. M.M. has remarried, and is the primary caretaker of two children from his second marriage. He also cares for his four stepchildren. At the time of trial, M.M. was a full-time college student.

M.M. wants to keep his parental rights, and therefore opposes G.P.B.'s request to adopt the boys. He seeks only supervised visitation, not custody of A.M. and R.M.

At trial, both sides relied on experts. Dr. Dov Hammer, testifying for G.P.B., stated that he believed adoption to be in the boys' best interests. Dr. Hammer testified that the younger boy, A.M., has no recollection of his biological father and is completely bonded to his mother and stepfather. By contrast, R.M. shows symptoms of anxiety about M.M. R.M. was quite young when M.M.'s mental illness was uncontrolled. R.M.'s recollection of

M.M.'s irrational behavior has left R.M. with substantial feelings of anxiety. Additionally, R.M. is less secure about the stability of his family. Terminating the biological father's parental rights and granting the stepfather's petition, in Dr. Hammer's opinion, would alleviate R.M.'s anxieties.

M.M.'s expert, Dr. Rao Gogineni, reached the opposite conclusion. Dr. Gogineni stated that terminating M.M.'s parental rights would indicate to the boys "that part of them[, that is, their natural father,] is bad." According to Dr. Gogineni, the children's interests would be served best by reinitiating contact with M.M. He believed that the children could form a relationship in which they identify M.M. as their father.

The Family Part granted the adoption, finding that the evidence met the standards of *N.J.S.A.* 9:3–46(a). In particular, the court found that for more than six months the children have not perceived M.M. as their father. Consequently, the court entered an order terminating M.M.'s parental rights.

The Appellate Division reversed. It reasoned that although the children had no relationship with M.M., the appropriate test was whether continuation of M.M.'s parental rights would result in imminent danger of serious harm to the children. Finding no such danger, the Appellate Division reversed the judgment of adoption.

## II.

### A.

■ The bond between parent and child remains society's most fundamental relationship. See *Santosky v. Kramer*, 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982); *Stanley v. Illinois*, 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972); *Wisconsin v. Yoder*, 406 *U.S.* 205, 232, 92 *S.Ct.* 1526, 1541–42, 32 *L.Ed.*2d 15 (1972); *Pierce v. Society of Sisters*, 268 *U.S.* 510, 535, 45 *S.Ct.* 571, 573, 69 *L.Ed.* 1070 (1925). Parents enjoy wide latitude in caring for their children. Respect for parental rights also entails consideration of

the rights of children. Parents who forsake their children run the risk that others may take their place. The abdication of parental responsibilities can lead to the loss of parental rights and to the adoption of a child.

Before authorizing the adoption of a child, a court must terminate parental rights of the biological parent. *See In re P.S.*, 315 *N.J.Super.* 91, 107, 716 *A.2d* 1171 (App.Div.1998). Terminating parental rights implicates fundamental liberty interests that are protected under the United States Constitution. *See Santosky, supra,* 455 *U.S.* at 753, 102 *S.Ct.* at 1394, 71 *L.Ed.*2d 599; *Quilloin v. Walcott,* 434 *U.S.* 246, 255, 98 *S.Ct.* 549, 554, 54 *L.Ed.*2d 511 (1978); *In re L.A.S.,* 134 *N.J.* 127, 132–33, 631 *A.2d* 928 (1993). The termination of parental rights involves consideration of the nature of the right, the permanency of the threatened loss, and an evaluation of parental unfitness. *L.A.S., supra,* 134 *N.J.* at 132–33, 631 *A.2d* 928. Merely showing that a child would be better off with an adoptive parent rather than with the biological parent is not enough. *See New Jersey Div. of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 603, 512 *A.2d* 438 (1986).

Generally, courts do not terminate parental rights when the parent has maintained a relationship with a child. Conversely, when an adoptive parent has provided the child with a permanent home, courts often protect the child from interference by a biological parent with whom the child has no relationship. *E.E.B. v. D.A.,* 89 *N.J.* 595, 446 *A.2d* 871 (1982); *Sorentino v. Family and Children's Society of Elizabeth,* 74 *N.J.* 313, 378 *A.2d* 18 (1977).

In recent years, increasing concern has arisen for the best interests of children whose parents have forsaken their parental duties. The child's right to a permanent home has gained increasing prominence. *See, e.g., DeBoer v. DeBoer,* 509 *U.S.* 938, 114 *S.Ct.* 11, 125 *L.Ed.*2d 763 (1993) (Blackmun, J., dissenting from denial of certiorari where child sought to have custody contest between biological and adoptive parents determined on basis of her best interests); Elizabeth S. Scott & Robert E. Scott, *Parents*

*as Fiduciaries,* 81 Va. L.Rev. 2401, 2473 (1995) (noting that public reaction to prominent cases "indicates a powerful disquiet with a legal regime that speaks in the language of parental rights").

### B.

The New Jersey Legislature has responded to those concerns by repeatedly amending the relevant statutes. Until 1994, the statute controlling termination of parental rights simply stated that such rights could be not be terminated unless the court found that the parent "failed to perform the regular and expected parental functions of care and support of the child, [including] maintenance of an emotional relationship." *N.J.S.A.* 9:3–46(a) (amended 1994). Courts interpreted that version of the statute to mean that termination of parental rights depended on a finding that the biological parent had abandoned or neglected the child. *See L.A.S., supra,* 134 *N.J.* at 134, 631 *A.2d* 928. To find abandonment or neglect, courts required conduct showing a settled purpose to forsake parental responsibilities. *See id.* at 135, 631 *A.2d* 928; *A.W., supra,* 103 *N.J.* at 616, 512 *A.2d* 438. In the alternative, a court could terminate parental rights if the parent's conduct harmed or posed threat of immediate harm to the child. *See L.A.S., supra,* 134 *N.J.* at 135, 631 *A.2d* 928; *A.W., supra,* 103 *N.J.* at 616, 512 *A.2d* 438. That approach favored the interests of the biological parent. It set a high bar for termination of rights, and ignored the interest of the child in a permanent relationship. James B. Boskey, *Adoption Committee of the Family Law Section of the New Jersey State Bar Association,* The Proposed New Adoption Statute § 685, at 2 (unpublished policy paper).

In 1994, the Legislature amended the statute to emphasize the needs of the child. *L.* 1993, *c.* 345, sec. 9 (effective April 27, 1994); *see also* Boskey, *supra;* Lisa J. Trembly, Note, *Untangling the Adoption Web,* 18 *Seton Hall Legis. J.* 371 (1993). The 1994 amendment provided an objective definition of "regular and expected parental functions" that specified three activities constituting "the core values of parenthood." *In re W.P.,* 308 *N.J.Super.*

376, 385, 706 *A.*2d 198 (App.Div.1998). Specifically, those functions included:

(a) the maintenance of a relationship with the child such that the child perceives the person as his parent;

(b) communicating with the child or person having legal custody of the child and parenting time rights unless having parenting time is impossible because of the parent's confinement in an institution, or unless prevented from so doing by the custodial parent or other custodian of the child or a social service agency over the birth parent's objection; or

(c) providing financial support for the child unless prevented from doing so by the custodial parent or other custodian of the child or a social service agency.

[*N.J.S.A.* 9:3–46.]

In addition, the Legislature provided that a parent shall be presumed to have failed in those functions if unable or unwilling to perform them for six or more months. *Ibid.* The statute continued to provide that parental rights could not be terminated unless the court found that the parent failed in those functions.

■ Since 1994, therefore, the statute has declared that the care and support of a child should include three functions: maintenance of the parental relationship, communication between parent and child, or providing financial support for the child. The use of the word "include" demonstrates that the list is not exhaustive. *See In re W.P., supra,* 308 *N.J.Super.* at 384–85, 706 *A.*2d 198; *see also Fraser v. Robin Dee Day Camp,* 44 *N.J.* 480, 486, 210 *A.*2d 208 (1965)(explaining that "include" is normally used as a word of enlargement, not of limitation). Furthermore, the disjunctive "or" indicates that parents need not fulfill all three functions to defeat a request to terminate their parental rights. *See In re W.P., supra,* 308 *N.J.Super.* at 384, 706 *A.*2d 198; *see also State v. Smith,* 262 *N.J.Super.* 487, 506, 621 *A.*2d 493 (App.Div.), *certif. denied,* 134 *N.J.* 476, 634 *A.*2d 523 (1993)(noting that the use of the word "or" at the end of a list indicates that the list is disjunctive).

■ Remaining is the question whether the failure of a single parental function triggers the mandate that the court "shall" terminate parental rights. The statute's use of the plural "functions," suggests that a parent must perform at least two functions.

Thus, a parent must fail in at least two of the three listed functions before a court should terminate parental rights. Conversely, fulfillment of only one function will not provide a defense to an action to terminate parental rights. *See In re W.P., supra,* 308 *N.J.Super.* at 384–85, 706 *A.2d* 198.

The first of the listed functions, the relationship between parent and child, merits special attention. When the Legislature amended the statute in 1994, it replaced the requirement that the parent maintain an "emotional relationship" with the child with the requirement of "the maintenance of a relationship ... such that the child perceives the person as his parent." That amendment shifts the focus from the parent's obligation to the child's perception of the relationship.

"Perceive," which the statute does not define, ordinarily means "to become conscious of; to recognize and identify." *Webster's Third International Dictionary* (G. & C. Merriam Co.1966). Here, M.M. argues that "perception" means only that his sons must be aware that he is their father. Thus, he contends that he satisfies the requirement if his sons realize that he is their biological father.

Such a reading is implausibly narrow. A more realistic reading is that a court should consider whether in the child's eyes the person is not just a procreator, but one who acts like a parent. The touchstone is whether a parent can give the child "nurture and affection." *See New Jersey Div. of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 606, 512 *A.2d* 438 (1986) (stating test for terminating for parental rights and proceedings initiated by Division of Youth and Family Services under Title 30).

The emphasis is on the existence of an actual parental relationship, not merely the parent's knowledge of the child's development. In *In re D.M.H.,* 135 *N.J.* 473, 641 *A.2d* 235 (1994), this Court considered a contested adoption in which the biological mother voluntarily gave up her child, but then, a year later, sought to reclaim him. In the intervening year, the biological

mother called the adoptive parents monthly for news and photo-
graphs of the child. The mother, however, did not indicate that
she intended to take back her child. Near the child's first
birthday, the biological mother saw him for the first time since
birth. The following day she filed a complaint for custody. *Id.* at
478–79, 641 *A.*2d 235.

At that time, the grounds for termination of parental rights
were abandonment or parental unfitness. Despite the biological
mother's regular communication with the adoptive parents, the
Court found that she had abandoned the child. *Id.* at 490, 641
*A.*2d 235. Her actions indicated a "willful or purposeful repudia-
tion of parental responsibilities." *Id.* at 481, 641 *A.*2d 235. The
Court rejected the biological mother's request for visitation, con-
cluding that "[n]othing in the record . . . suggests that the child's
best interests might require a continuing relationship with his
biological mother." *Id.* at 490, 641 *A.*2d 235. As we concluded,
the biological mother was "for all practical purposes a complete
stranger" to the child. *Ibid.*

Although the statute no longer specifies abandonment as a
ground for termination, the analysis *In re D.M.H.* is instructive.
Like the birth mother in *D.M.H.*, M.M. is a stranger to his sons.
Although M.M. has communicated with A.B., he has no relation-
ship with the boys. They know that he is their biological father,
but do not regard him as their actual father. In fairness to M.M.,
the absence of a stronger relationship is due in part to A.B.'s
efforts to shield his sons from him.

In 1998, the Legislature amended *N.J.S.A.* 9:3–46 to underscore
the significance of the affirmative assumption of parental duties.
Fairly read, the amendment reflects decreasing legislative toler-
ance for biological parents who engage in the act of procreation,
but do not assume the responsibilities of parenthood. First, when
determining the best interests of the child in an action to termi-
nate parental rights, the statute expressly states that "[t]he best
interest of the child requires that a parent affirmatively assume

the duties encompassed by the role of being a parent." *L.* 1998, *c.* 20, sec. 2 (effective September 11, 1998).[1]

In a separate paragraph, the Legislature expressly provided that a judgment of adoption "shall be entered over an objection of [a biological parent] if the court finds, during the six-month period prior to the placement of the child for adoption or within [certain time periods], in the case of a child placed for adoption as a newborn infant," that the parent has substantially failed to perform the regular and expected parental functions of care and support or is unable to perform those functions and that the parent's inability to perform those functions is unlikely to change in the immediate future.[2] When children are placed for adoption, biological parents who have substantially failed or are unable to

---

[1] The relevant paragraph states:

In a contest between a person who is entitled to notice pursuant to section 9 of *P.L.* 1977, *c.* 367 (C.9:3–45) objecting to the adoption and the prospective adoptive parent, the standard shall be the best interest of the child. The best interest of a child requires that a parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations for the birth and care of the child, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

[2] The relevant paragraph states:

A judgment of adoption shall be entered over an objection of a person who is entitled to notice pursuant to section 9 of *P.L.* 1977, *c.* 367 (C. 9:3–45) communicated to the court by personal appearance or by letter if the court finds, during the six-month period prior to the placement of the child for adoption or within 120 days after the birth of a child or prior to the date of the preliminary hearing, whichever occurs first, in the case of a child placed for adoption as a newborn infant:

(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or

(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.

perform their parental functions within limited periods of time shall lose their parental rights. In contrast, before the 1998 amendment, *N.J.S.A.* 9:3–46 stated that the adoption shall "not" be granted over the objection of a biological parent "unless" the court found that the parent has substantially failed to perform the regular and expected functions of child care and support. Thus, the 1998 amendment mandates granting the adoption if the court finds the existence of the prescribed conditions, instead of prohibiting the adoption absent the existence of those conditions. *In re P.S.,* 315 *N.J.Super.* 91, 115, 716 *A.*2d 1171 (App.Div.1998).

 The specified periods of limitation do not apply to all adoptions under Title 9. When a child has been living with one biological parent since birth, that child has not been "placed for adoption." Hence, the periods of limitation do not apply. The adoption proceedings in such a case initially turn not on the determination of the failure or inability of the objecting parent, but on the "best interest of the child."

 In several respects, parental duties as they relate to the "best interest of the child" under *N.J.S.A.* 9:3–46(a) differ from the "regular and expected parental functions" under *N.J.S.A.* 9:3–46(a)(1) and (2). First, the specified duties in "the best interest" analysis are not as onerous as those required in the performance of "regular and expected parental functions." A parent seeking to show that he or she has "affirmatively assume[d] the duties of being a parent" need only "demonstrat[e] . . . the establishment and maintenance of a place of importance in the child's life." In contrast, a parent seeking to show that he or she has performed "the regular and expected parental functions of care and support" must prove that "the child perceives the person as his parent." Similarly, the "demonstration of a continued interest in the child [and] a genuine effort to maintain communication with the child" under the "best interest" analysis is not as difficult as a demonstration under *N.J.S.A.* 9:3–46(a)(2)(b) that the person has actually communicated with the child or person having custody, as re-

quired in the performance of "regular and expected parental duties."

Although stated differently, the financial obligations of a biological parent are substantially similar under both the best interest standard and the standard for determining whether a parent has performed the regular and expected obligations of parenthood. Under the best interest test, the relevant consideration is "the fulfillment of financial obligations for the birth and care of the child." By comparison, under the standard applicable to assessing the performance of parental functions, the test is whether the parent has provided "financial support for the child." *N.J.S.A.* 9:3–46a(2)(b).

Second, the two standards differ in the measurement of a parent's performance. The measurement of the "regular and expected parental functions" includes consideration of a parent's ability to perform, but the best interest analysis focuses solely on whether the parent has performed the duties, without regard to the parent's ability to perform.

Finally, and of particular relevance to the instant case, the two provisions of the statute set different time frames. Under *N.J.S.A.* 9:3–46(a) no time limit applies to the determination of the best interest of the child. In contrast, the time to determine whether an objecting parent has "failed to perform the regular and expected parental functions of care and support" is "the six month period prior to the placement of the child for adoption." *N.J.S.A.* 9:3–46a(2)(c).

C.

Adoptions, whether under Title 9, the general adoption statute, or Title 30, the statute concerned with adoptions instituted by DYFS, depend primarily on legislative enactments. At one time, we read both statutory schemes as depending on proof of harm to the child. *Baby M, supra,* 109 *N.J.* at 426, 537 *A.2d* 1227. In recent years, the Legislature has set different standards for Title 9 proceedings.

Under Title 30, the "best interests" test continues to concentrate on whether the parent has harmed or is likely to continue to harm the child. *See In re K.H.O.,* 161 *N.J.* 337, 347–48, 736 *A.*2d 1246 (1999); *In re D.M.H.,* 161 *N.J.* 365, 376–77, 736 *A.*2d 1261 (1999). *N.J.S.A.* 30:4C–15.1(a), for example, sets forth a four-prong test to determine a child's best interest; three of the four prongs focus on harm to the child. The first prong asks whether the parent has harmed the child, the second whether the parent is unable or unwilling to eliminate the harm, and the fourth whether the termination of parental rights will do more harm than good. Under Title 30, then, harm to the child's safety, health, or development, can lead to the termination of parental rights.

In Title 9 proceedings, the Legislature has redirected the focus from harm to the child to the discharge of parental functions. Although the failure of a parent to discharge parental functions often will harm the child, Title 9 proceedings are less concerned with such harm and more with the parent's willingness and ability to provide effective parenting. To that end, *N.J.S.A.* 9:3–46 directs courts to consider whether the objecting parent has affirmatively assumed his or her parental duties and has fulfilled the "regular and expected parental functions of care and support."

In sum, when considering a termination of parental rights in an adoption proceeding, the Family Part generally should ask whether the objecting parent has "substantially failed to perform the regular and expected parental functions of care and support of the child" within the relevant time. If the court finds that the objecting parent has failed in performing those functions, it must determine whether the parent was able to fulfill them. When assessing the objecting parent's inability, the court should consider whether the custodial parent has contributed to that inability by blocking the objecting parent's access to the child.

If the court finds that the objecting parent has failed in performing his or her parental functions, it "shall" enter the judgment of adoption over the parent's objection. If, however, the

court finds that the objecting parent has not failed in performing his or her parental functions, the court should determine what resolution is in the best interest of the child. Alternatively, if the court finds that the relevant time period does not apply, the court should then turn to the best interest analysis.

When answering these questions, the court should consider whether the objecting parent has affirmatively assumed the duties of a parent as defined in *N.J.S.A.* 9:3–46(a). The court, however, also may consider other factors in determining the child's best interest. In considering those factors, the court should avoid a comparative analysis of the birth parent with the adoptive parent. As we have noted, the question is not whether the child would be better off with the adoptive parent, but whether the biological parent has failed to fulfill his or her duties.

In its decision below, the Appellate Division focused on "whether continuation of the parental relationship would place the child in imminent danger of serious harm." 311 *N.J.Super.* 38, 45, 709 *A.*2d 271 (1998) (internal quotations omitted). Finding that M.M. posed no danger to the children, the court reversed the termination of his parental rights. *Id.* at 48, 709 *A.*2d 271. It also found that the record did not support "the proposition that M.M. has relinquished his parental role." *Ibid.* We disagree. Even under *N.J.S.A.* 9:3–46(a) as it existed before the 1998 amendment, the emphasis on the threat of imminent harm to the child was misplaced.

Because A.M. and R.M. were never placed for adoption, the Family Part need not consider on remand whether M.M. failed in performing the "regular and expected functions of care and support" in the six months prior to the "placement of the child[ren] for adoption." Rather, the court should look to the best interest analysis and determine whether, over the course of his sons' lives, M.M. has affirmatively assumed the specified parental duties.

The judgment of the Appellate Division is reversed and the matter is remanded to the Family Part.

**O'HERN, J., concurring.**

Termination of parental rights presents the legal system with an almost insoluble dilemma. On the one hand, we emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' * * * 'basic civil rights of man,' * * * and '[r]ights far more precious * * * than property rights' * * *." *Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972) (citations omitted). The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected. On the other hand, it has been recognized "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.,* 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) (citing *Wisconsin v. Yoder,* 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)).

\* \* \* \*

"Termination of parental rights is essentially, of course, a statutory proceeding; but the statute does not say it all. Overlying constitutional considerations, constantly recurring statutory amendments, and the rapidly evolving nature of present-day social theory and public policy make judicial interpretation an inevitable and indispensable part of critical legal operation." *Champagne v. Welfare Div. of Nevada State Dep't of Human Resources,* 100 *Nev.* 640, 663, 691 *P.*2d 849, 865 (1984). Indeed, were the sole criterion stated to be in terms of the best interests of the child, it would be suspect for vagueness because of the important constitutional interests involved.

[*New Jersey Div. of Youth and Family Servs. v. A.W. and R.W., Jr.,* 103 *N.J.* 591, 599, 601, 512 *A.*2d 438 (1986).]

*N.J.S.A.* 9:3–46 elaborates on the best interests standard by cataloguing the circumstances in which the Legislature has determined that a child's health and welfare will be seriously impaired by continuing an existing parental relationship. The judicial inquiry should focus on the conduct specified by the Legislature as evidence of the type of harm that children should be spared. For example, a father who never sees his child or never makes efforts to be a part of a child's life sufficient to cause the child to view the person as a parent, causes harm to the child. Children have a profound interest in permanency and knowing who their parents are. The problem is compounded here because the adopting party is a step-parent who has bonded with the two children. *See In re Guardianship of J.C. and J.M.C.,* 129 *N.J.* 1, 25–26, 608 *A.*2d 1312 (1992) (requiring remand to determine whether children had

"bonded with their foster parents and if so whether breaking such bonds would cause the children serious psychological or emotional harm.").

Under *N.J.S.A.* 9:3–46a, in order to determine best interests, the court considers whether the parent has fulfilled financial obligations toward the child, whether the parent has demonstrated "continued interest in the child," whether the parent has made "a genuine effort to maintain communication with the child," and whether the parent has "a place of importance in the child's life."

The statute then sets forth time periods in a child's life when the standards must be met, such as, for example, within the crucial first months of a child's life. Under *N.J.S.A.* 9:3–46a(1) and (2), an adoption may be entered over the objection of a parent if the court finds that during the relevant time periods, either "the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so," or the parent is unable to do so. The "regular and expected parental functions of care and support" include "the maintenance of a relationship with the child such that the child perceives the person as his parent ... communicating with the child ... unless prevented from so doing," and "providing financial support ... unless prevented from doing so." *N.J.S.A.* 9:3–46a(2)(a), (b) and (c).

The elements of these composite tests are intended to indicate whether a parent has failed and thereby harmed a child and whether that harm is likely to continue if the relationship is not ended.

*N.J.S.A.* 9:3–46 comports with the Court's reasoning in *In re Baby M.*, 109 *N.J.* 396, 537 *A.*2d 1227 (1988), also a contested adoption case. Although "[t]he statutory descriptions [in Title 30 guardianship actions and Title 9 adoption actions] of the conditions required to terminate parental rights differ; their interpretation in case law ... tends to equate them." 109 *N.J.* at 444, 537 *A.*2d 1227. Our former Chief Justice Wilentz explained:

> Although the question of best interests of the child is dispositive of the custody issue in a dispute between natural parents, it does not govern the question of termination. It has long been decided that the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights.... It must be noted, despite some language to the contrary, that the interests of the child are not the only interests involved when termination issues are raised. The parent's rights, both constitutional and statutory, have their own independent vitality.
>
> [*Baby M., supra,* 109 *N.J.* at 445, 537 *A.2d* 1227 (citations omitted).]

On remand, the Family Part must make the qualitative determination, using the analytical framework of the statute, of whether the physical or mental health of the children has been and will continue be jeopardized by their relationship with their father. *Parham, supra,* 442 *U.S.* at 603, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119.

Justice STEIN joins this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.