# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1089-22

IN THE MATTER OF
THE ADOPTION OF A
CHILD BY A.W.R.

_____

Submitted September 18, 2023 – Decided December 7, 2023

Before Judges DeAlmeida and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FA-04-0073-22.

Sherman, Silverstein, Kohl, Rose & Podolsky, PA, attorneys for appellant D.C. (Matthew Podolnick and Kristofer B. Chiesa, on the briefs).

Obermayer Rebmann Maxwell & Hippel, LLP, attorneys for respondents A.W.R. and K.S. (Allison Burkhardt, on the brief).

PER CURIAM

Appellant D.C. appeals from the November 29, 2022 order of the Family Part terminating his parental rights to his ten-year-old child, D.H.C., to permit the child to be adopted by his stepfather, A.W.R.[1] We affirm.

I.

D.H.C. was born in 2012. He is the child of D.C. and K.S., who never married. D.H.C.'s parents have not resided together since he was six months old. K.S. alleges she and the child moved from the residence they shared with D.C. after he engaged in domestic violence.

K.S. and the child have resided with A.W.R. since December 30, 2015. A.W.R. has a child from a prior relationship, Q.R., born in 2011. Q.R. lives in the couple's home with D.H.C. when A.W.R. is parenting Q.R. under an arrangement with Q.R.'s mother. In 2018, K.S. and A.W.R. had a child, P.R., who also resides with the couple and her half siblings. In 2021, K.S. and A.W.R. married.

In September 2021, A.W.R. filed a complaint in the Family Part seeking to adopt D.H.C. He alleged that his stepson has been under his continuous care

---

[1] We refer to the parties, child, and the child's siblings by initials to protect the confidentiality of records relating to the adoption. N.J.S.A. 9:3-52(a); R. 1:38-3(d)(16).

2 A-1089-22

since 2016 and that D.C. has not been meaningfully involved in D.H.C.'s life since the child, then eight, was three years old.

After an exchange of discovery, A.W.R. moved for summary judgment seeking an order terminating D.C.'s parental rights to D.H.C. and setting a date for the finalization of A.W.R.'s adoption of the child. He submitted evidence that over a six-year period he fulfilled the role of D.H.C.'s parent, and financially and emotionally supported the child, who views him as his father.

Discovery revealed that in 2013, the Family Part ordered D.C. to pay K.S. $75 per week in child support. As of September 2022, D.C. had accumulated child support arrears of $19,700, in large part because he did not make payments during numerous periods of incarceration. D.C.'s terms of imprisonment mostly arose from his substance abuse history. He admits to abusing heroin and has spent periods in residential substance abuse treatment programs.

In addition, in 2016, the Family Part entered an order providing D.C. with two hours of supervised visitation with D.H.C. every Saturday and Skype calls with the child twice a week. D.C. did not visit the child regularly and has not had any contact with him since late 2016 or early 2017. Although D.C. claims K.S. interfered with his ability to contact and visit D.H.C., he has never filed an application with the court seeking relief with respect to contact or visitation.

A-1089-22

It was only after the adoption complaint was filed that D.C. filed an application with the Family Part concerning contact and visitation. His application included a request to reduce his child support obligation. In support of his application, D.C. stated that he was seeking relief because he had been out of prison for a year and would "never leave [his] son's life again for anything" and was ready to have a relationship with the child. Six months later, D.C. was incarcerated in Georgia, where he then lived, for "battery family violence." The trial court dismissed D.C.'s modification application without prejudice pending the resolution of A.W.R.'s complaint to terminate D.C.'s parental rights.

In response to discovery demands, D.C. was unable to identify the last time he visited the child or provide any details regarding telephone calls with or text messages to D.H.C. He could not identify a single gift he gave to the child in the past five years. The record contains two text messages that appear to indicate that D.C. purchased an unidentified item for the child via Amazon.

In 2020, D.C. told K.S. in writing that he would not ask for visitation with D.H.C. if she agreed to discontinue his child support obligation. A little more than a year later, D.C. told K.S. in writing that he would surrender his parental rights to D.H.C. if she returned to him the money seized by the probation

A-1089-22

department as payment toward his child support arrears. K.S. told D.C. in writing that she would allow him to communicate with D.H.C. if he surrendered his parental rights to the child.

D.C. opposed the motion. He denied having abandoned the child, arguing that K.S. prevented him from visiting and communicating with D.H.C. D.C. acknowledged, however, that he was frequently incarcerated, in substance abuse treatment, or abusing drugs during the child's life. He alleged that he was sober, employed, living in Georgia with a daughter he had shortly before the complaint was filed, and was prepared to reestablish a relationship with D.H.C.

On November 29, 2022, the trial court issued an oral opinion granting A.W.R.'s motion. The court found that D.C. had not demonstrated any of the four factors set forth in N.J.S.A. 9:3-46(a) to establish that he had "affirmatively assume[d] the duties encompassed by the role of being a parent" to D.H.C.

First, the court concluded that D.C. had not fulfilled the financial obligation for the care of D.H.C. In support of that finding, the court noted that while D.C. made some payments toward his child support obligation, he amassed significant arrears and did not seek judicial relief relating to his inability to earn an income during his periods of incarceration.

Second, the court concluded that D.C. did not demonstrate continued interest in D.H.C.  While the court agreed that D.C. occasionally attempted to visit the child, it concluded that those attempts were "sporadic at best."  The court found that D.C. was rebuffed by K.S. on the few occasions that he reached out to her after long periods of absence to request a visit with D.H.C.  Yet, the court found, while D.C. was quick to threaten to seek judicial relief compelling a visit, he never followed through, evidencing his lack of continued interest in the child.  In addition, the court found that "[t]here certainly has not been any attempt to come back to New Jersey by [D.C.] to see [D.H.C.]."

Third, the court found that D.C. did not demonstrate a genuine effort to maintain communication with D.H.C.  As was the case with attempts at visitation, the court concluded that D.C. sporadically contacted K.S. asking to speak with the child after long periods of him being absent.  When rebuffed, D.C. did not follow through on seeking judicial relief.  The court found that "[f]or the past six years, there has been no communication with the child, no connection to the child.  . . .  So we don't have a genuine effort to maintain communication with [the] child."

Fourth, the court concluded that D.C. did not demonstrate that he established and maintained a place of importance in D.H.C.'s life.  Relying on

A-1089-22

its findings with respect to the other factors, as well as D.C.'s offer to surrender his parental rights in exchange for being relieved of his child support obligation and the return of funds withheld from him to pay arrears, the court concluded that "[t]here's not a scintilla of evidence before me that shows anything but looking for a financial gain on the back of this child. It certainly doesn't demonstrate any love, care or respect for the child."

The court concluded that "this child hasn't seen [D.C.] in at least six years. He has not heard or spoken to [D.C.] in the past six years. Unfortunately, there is no attachment to the child. There is not [a] bond here that we want to see." After noting that A.W.R. had been serving as a father to D.H.C. for over six years, the court found that it was in D.H.C.'s best interest for D.C.'s parental rights to be terminated and for the adoption to proceed. The court concluded its opinion by addressing D.C.:

> And, [D.C.], you had a tough life. The court understands that. And there were . . . sporadic attempts, but there was never, ever, ever any follow through of attempting to make that bond with your son. And when it's all said and done, it was all about the money.

A November 29, 2022 order terminates D.C.'s parental rights to D.H.C. and refers the matter to the Office of the Surrogate to set a date for the adoption.[2]

---

[2] The record does not reveal whether the adoption has taken place.

A-1089-22

This appeal follows. D.C. argues that the trial court erred by resolving genuine issues of material fact without holding an evidentiary hearing. He argues that the number of gifts he gave to D.H.C. and the extent of K.S.'s interference with his attempts to contact the child were unresolved material issues of fact at the time summary judgment was granted. In addition, he argues that when the court granted summary judgment his motion to compel additional discovery was pending. According to D.C., the subjects of that motion were his communications with K.S. concerning the child and evidence of gifts he gave the child.

## II.

Our review of a Family Part's judgment is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e do not overturn those determinations unless the court abused its discretion, failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J. Super. 464, 479 (App. Div. 2004). We must accord substantial deference to the findings of the Family Part due to that court's "special jurisdiction and expertise in family matters . . . ." Cesare, 154 N.J. at 413.

In addition, we review a grant of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

"It is beyond dispute that the termination of parental rights implicates a fundamental liberty interest." N.J. Div. of Youth and Fam. Servs. v. B.R., 192 N.J. 301, 305 (2007) (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)). The Supreme Court has emphasized

> the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been

9

A-1089-22

> deemed 'essential', . . . 'basic civil rights of man,' . . . and '[r]ights far more precious . . . than property rights . . . .'" The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected.
>
> [N.J. Div. of Youth and Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986) (quoting Stanley, 405 U.S. at 651).]

"Before authorizing the adoption of a child, a court must terminate parental rights of the biological parent." In re Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404 (1999). "The termination of parental rights involves consideration of the nature of the right, the permanency of the threatened loss, and an evaluation of parental unfitness. Merely showing that a child would be better off with an adoptive parent rather than with the biological parent is not enough." Ibid. (citation omitted). "Generally, courts do not terminate parental rights when the parent has maintained a relationship with a child. Conversely, when an adoptive parent has provided the child with a permanent home, courts often protect the child from interference by a biological parent with whom the child has no relationship." Ibid.

These competing interests are reflected in N.J.S.A. 9:3-46(a), which permits the termination of a biological parent's parental rights to allow adoption of a child by a stepparent married to a biological parent with whom the child has lived since birth. The statute provides, in relevant part:

> [i]n a contest between a [biological parent] objecting to the adoption and the prospective adoptive parent, the standard shall be the best interest of the child. The best interest of the child requires that a parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations for the birth and care of the child, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.
>
> [N.J.S.A. 9:3-46(a).]

The statute must "be liberally construed" to promote "the best interest of children" and to ensure that "the safety of children" is "of paramount concern." N.J.S.A. 9:3-37.

We have carefully reviewed the record in light of D.C.'s arguments and the applicable law and find no basis on which to disturb the trial court's opinion. There is sufficient, credible, and undisputed evidence in the record supporting the trial court's findings with respect to each of the factors set forth in N.J.S.A. 9:3-46(a) and its conclusion that it would be in D.H.C.'s best interest to terminate D.C.'s parental rights to permit the child to be adopted by the stepfather who has provided him with a stable home and the financial, emotional, and familial support to which he is entitled. The record demonstrates that D.C.'s struggles

11

with substance abuse and the resulting periods of incarceration, relocation to Georgia, and his recent imprisonment for domestic battery have rendered him unable to affirmatively assume the duties of a parent to D.H.C.

We are not persuaded by D.C.'s arguments that the trial court erred by resolving genuine issues of material fact without a hearing or by entering summary judgment without deciding D.C.'s pending motion to compel discovery. The trial court accepted as true D.C.'s allegation that after his incarceration from 2017 to 2019, K.S. rebuffed his attempts to contact and visit D.H.C. The court found, however, that those attempts by D.H.C. were sporadic and that he made no effort to come to New Jersey to visit the child or to seek judicial relief for what he claimed to be unreasonable denials of access to the child by K.S. Additional discovery relating to D.H.C.'s communications with K.S. or the number of gifts he provided the child would not alter this court's conclusion. It is clear from the record that D.C. made no genuine effort to see his child, provide D.H.C. with meaningful financial support, or to maintain a meaningful presence in his son's life as a father.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

12

A-1089-22