IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 6, 2004 Session

IN RE **ADOPTION OF S.M.F.**

**Appeal from the Chancery Court for Rutherford County**
**No. 01-3634AD    Robert E. Corlew, III, Chancellor**

**No. M2004-00876-COA-R9-PT** - **Filed December 6, 2004**

This appeal involves the parental relationship between a three-year-old child and her biological father. Shortly after the child's birth in Ohio, her mother placed her for adoption with relatives residing in Tennessee. These relatives filed a petition in the Chancery Court for Rutherford County seeking to terminate the biological father's parental rights and to adopt the child. The biological father thereafter filed a petition to establish parentage. Following a bench trial, the trial court established the child's parentage and determined that the biological father had not abandoned the child. Accordingly, the trial court denied the adoptive parents' petition to terminate the biological father's parental rights and to adopt the child. Because it had reserved ruling on the custody and visitation arrangements, the trial court granted the adoptive parent's application for an interlocutory appeal pursuant to Tenn. R. App. P. 9. We concur that an interlocutory appeal is warranted in this case. We also concur with the trial court's conclusion that the adoptive parents failed to prove by clear and convincing evidence that the biological father abandoned his daughter.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Daryl M. South and Gary D. Beasley, Murfreesboro, Tennessee, for the appellants, J.A.P. and C.L.P.

Dinah J. Michael, Murfreesboro, Tennessee, for the appellee, J.M.S.

**OPINION**

**I.**

The biological mother in this case, K.M.F., lives in Versailles, Ohio, a small town of approximately 2,000 people. At all times relevant to this case, she was married to L.B.B., and she and L.B.B. had one child together. K.M.F. and L.B.B. parted ways in 1998 but did not divorce. K.M.F. engaged in a sexual relationship with J.M.S. from January to April 2001 and, both before and after this time, had sexual liaisons with other men.

K.M.F. began gaining weight during the summer of 2001, so much so that there were rumors around town that she was pregnant. She did not believe that she could be pregnant because she was taking birth control pills. When several of her friends broached the topic with her, she adamantly denied any suggestion that she was pregnant. Finally, at the urging of her grandmother, K.M.F. scheduled an appointment with a physician to determine the cause of her unexpected weight gain. On August 17 or 18 of 2001, the physician informed K.M.F. that she was, indeed, pregnant.

K.M.F. believed that J.M.S. was the child's father. A week or so after learning that she was pregnant, K.M.F. telephoned J.M.S. at his place of employment to arrange a face-to-face meeting to share the news of her pregnancy with him. On both occasions, J.M.S. told K.M.F. that he was working long hours and that he would come by to see her when he got a chance. On September 4, 2001, K.M.F. wrote J.M.S. a letter informing him that she was pregnant and that she believed that he was the father of the child. In the letter, K.M.F. advised J.M.S. as follows: "If you want a say in what happens then you need to let it be known. . . . If you want to get a hold of me–you know [my] phone number." K.M.F. did not mention that she was approximately seven months pregnant at the time.

J.M.S. was unsure whether he was the child's father because it had been several months since his last sexual encounter with K.M.F. and because he was aware that K.M.F. had dated other men both before and after their liaison. He did not want to contact her immediately because he was angry with her and was afraid of provoking a confrontation. One of the things that upset him was K.M.F.'s heavy drinking during the summer and the possible effects it might have on the child. As a result, neither J.M.S. nor any of his family members contacted K.M.F. for approximately three weeks.

When J.M.S. did not respond to her letter immediately, K.M.F. decided that she would be required to make all the decisions regarding her pregnancy without J.M.S. She and her grandmother discussed placing the child for adoption, and her grandmother told her that relatives living in Tennessee, J.A.P. and C.L.P., had been trying to adopt a child for several years. After K.M.F.'s grandmother sent word to J.A.P. and C.L.P. that K.M.F. was considering placing her child for adoption, C.L.P. telephoned K.M.F. In October 2001, J.A.P. and C.L.P. contacted a Tennessee adoption agency and hired a Tennessee lawyer to assist with the adoption. A few days later, they also hired a lawyer in Ohio. C.L.P. asked K.M.F. to make sure that J.M.S. would agree to the adoption. However, J.A.P. and C.L.P. made no effort to contact J.M.S. themselves.

In the meantime, J.M.S. told his family and friends that he had decided to parent K.M.F.'s child if he turned out to be the father. Because he and K.M.F. were Caucasian and because K.M.F.'s husband and many of the men she dated were African-American, J.M.S. believed that he would have a better idea whether he was the child's father after the child was born. Accordingly, J.M.S.'s mother and others informed K.M.F. that J.M.S. wanted to be notified when the child was born and that he was interested in obtaining genetic testing to confirm that the child was his. K.M.F. agreed to notify J.M.S.'s mother once the child was born. She did not, however, inform J.M.S. or his mother of the child's expected due date, and she did not tell them of her plans to place the baby for adoption immediately after birth.

K.M.F. gave birth to S.M.F. on Friday, November 2, 2001. J.A.P. and C.L.P., the adoptive parents, were at the hospital when K.M.F. gave birth. Neither they nor K.M.F. nor any other member

of her family notified J.M.S. that the baby had been born. J.M.S. did not learn of the child's birth until the evening of Sunday, November 4, 2001, when a third party told him that the child had been born. By that time, K.M.F. and the baby had been released from the hospital, and K.M.F. had already surrendered physical custody of the baby to J.A.P. and C.L.P.

On Monday, November 5, 2001, J.M.S. requested an agency in Ohio to conduct genetic testing to determine the parentage of S.M.F. That afternoon, J.M.S.'s mother informed K.M.F. that J.M.S. had filed the paperwork necessary to obtain a court-ordered genetic test and that she would be receiving a notice in the near future requiring her to bring the child in for genetic testing. During that conversation, K.M.F. informed J.M.S.'s mother that she had already surrendered physical custody of the child to J.A.P. and C.L.P. and that she intended to permit them to adopt S.M.F. Prior to this conversation, neither J.M.S. nor any member of his family knew or suspected that K.M.F. was planning to place the child for adoption.

K.M.F. immediately informed her lawyer[1] that J.M.S. had requested genetic testing. On November 6, 2001, K.M.F.'s lawyer informed J.A.P. and C.L.P. of the situation and advised them to leave with the baby as quickly as possible. J.A.P. and C.L.P. left Versailles with the baby and stayed in various hotels in Ohio until K.M.F. legally surrendered her parental rights to them. On November 9, 2001, K.M.F. surrendered her parental rights to J.A.P. and C.L.P. in Dayton, Ohio, and J.A.P. and C.L.P. immediately left with the baby for their home in Murfreesboro, Tennessee.

Before leaving Ohio, J.A.P. and C.L.P. signed a "Statement of Understanding of Legal Risk [of] Adoptive Placement and Statement of Where Adoption Will Be Finalized and Where Termination of Rights of Legal and Birth Father Will Take Place and by Whom." In it, they acknowledged that they had accepted physical custody and legal surrender of the baby from the mother only, and that a "legal father and a birth father are involved in this case, and neither the legal father's nor the birth father's rights have yet been terminated or otherwise addressed." J.A.P. and C.L.P. also acknowledged the following:

> We understand that our physical custody of [S.M.F.] and our plan to adopt said child is at risk of disruption by the natural and legal parents and that we may have to return her to either the mother . . . or to the legal or birth father. We accept physical custody of [S.M.F.] and will return with her to our home state of Tennessee with full knowledge of the legal, emotional, and financial risks inherent in this situation.

Later in November, J.M.S. received a notice to appear for genetic testing and presented himself to the testing agency as requested. K.M.F. received a similar notice to present the baby for testing, but by the time she received the notice, the baby was residing with J.A.P. and C.L.P. in Tennessee. K.M.F. made no effort to have the baby presented for genetic testing. In addition, J.M.S. retained an Ohio lawyer to assist him in protecting his parental rights. On November 28, 2001, J.M.S. registered with the Ohio Putative Father Registry. On the registration form, he provided the

---

[1] J.A.P. and C.L.P. were paying for K.M.F.'s lawyer.

baby's date of birth and skin color, gave K.M.F.'s name, address, and telephone number, and identified himself as the baby's father.

On November 29, 2001, J.A.P. and C.L.P. filed a petition in the Rutherford County Chancery Court seeking to terminate J.M.S.'s and L.B.B.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(1) and (9) (Supp. 2004)[2] and to adopt S.M.F. The petition acknowledged that J.M.S. was believed to be the child's biological father but asserted that J.A.P. and C.L.P. would prove the statutory grounds for termination by clear and convincing evidence. On the same day, the trial court granted J.A.P.'s and C.L.P.'s motion to appoint them as S.M.F.'s guardians.

J.M.S. received the termination petition less than two months after it was filed. On February 11, 2002, with the assistance of his Ohio lawyer, he filed a pro se answer. In his answer, J.M.S. requested genetic testing to settle the question of the child's parentage and sought dismissal of J.A.P.'s and C.L.P.'s petition to terminate his parental rights and to adopt S.M.F. During the ensuing months, J.M.S. believed that his lawyer in Ohio was doing everything that was legally necessary for him to obtain custody of S.M.F.

Eventually, J.M.S.'s Ohio lawyer informed him that he was unfamiliar with Tennessee's law and suggested that he retain a lawyer in Tennessee to help him protect his parental rights and to obtain custody of S.M.F. Within two days, J.M.S. began searching for a lawyer in Tennessee. After contacting ten to fifteen lawyers, J.M.S. finally found a lawyer who agreed to represent him. On September 27, 2002, J.M.S.'s Tennessee lawyer made her first formal appearance in the case.

On November 27, 2002, after attempting unsuccessfully to negotiate a visitation schedule with the lawyer representing J.A.P. and C.L.P., J.M.S.'s Tennessee lawyer filed a motion seeking visitation. J.A.P. and C.L.P. vigorously opposed the motion, arguing that the parties had agreed on a March 4, 2003 trial date and that it would be best to delay the issue of visitation until after the trial. On January 15, 2003, the trial court entered a scheduling order setting the case for trial on March 4, 2003. The trial court did not address the motion for visitation at that time.

The trial began on March 4, 2003. That morning, J.M.S. filed a separate petition to establish parentage in the trial court. His lawyer urged the trial court to address J.M.S.'s parentage petition before taking up the petition for adoption and termination of J.M.S.'s parental rights. The lawyer representing J.A.P. and C.L.P. responded that he was not prepared to go forward on the parentage petition and urged the trial court to proceed with the termination of J.M.S.'s and L.B.B.'s parental rights. In the alternative, he requested a continuance of the entire proceeding. He also opposed proceeding with J.M.S.'s parentage petition at that time because doing so would have "a great effect on what grounds are used" to terminate J.M.S.'s parental rights.

J.M.S.'s lawyer did not oppose the request for a continuance in light of the filing of the parentage petition. She argued that the law was clear that once a parentage petition has been filed,

---

[2]Tenn. Code Ann. § 36-1-113(g)(1), which applies only to a child's parent or guardian, allows for termination of parental rights on the basis of "abandonment" as defined in Tenn. Code Ann. § 36-1-102 (Supp. 2003). Tenn. Code Ann. § 36-1-113(g)(9), which applies to anyone who is not the child's legal parent or guardian, allows for termination of parental rights on several "additional grounds."

the trial court must address it first before considering a petition to terminate parental rights. J.A.P.'s and C.L.P.'s lawyer conceded that J.M.S.'s lawyer was correct in light of *Jones v. Garrett*, 92 S.W.3d 835 (Tenn. 2002), and he also acknowledged that the adoption statute specifically states that a pending paternity action must be heard before an adoption action can proceed. However, he objected to the fact that J.M.S. had waited until the day of trial to file his parentage petition.

The trial court then asked J.A.P.'s and C.L.P.'s lawyer whether he "would feel comfortable with our making a legal declaration for purposes of the paternity action that . . . [J.M.S.] is the legal father of the child and reserve the other issues with regard to the paternity [*i.e.*, custody and child support] and then proceed with the evidence contemplated on the petition to terminate those parental rights." In the course of his response, J.A.P.'s and C.L.P.'s lawyer admitted that the biological mother "will testify that he's the father of the child," and said, "specifically in answer to your question, I guess, we don't have any proof to suggest that he's not the father at this point."

The trial court then inquired of the parties regarding their witnesses, many of whom had traveled from Ohio to be present at the hearing. Following a brief colloquy, the lawyer representing J.A.P. and C.L.P. stated as follows:

> I talked to my clients and I think we're just going to withdraw the [request for a] continuance. If the court wants to proceed to hear the paternity action, I guess my problem is: this has been known for some time instead of just doing it just today but we withdraw the continuance and proceed. The court can declare . . . [J.M.S.] to be the father and we'll deal with it at this time.

He added later:

> [W]e're not waiving any objection to the procedural matter as far as whether or not you can grant the paternity . . . , we're simply withdrawing our motion for the continuance. In terms of if this goes up on appeal, I don't want it to be noted that we waived any objection as far as the procedural manner on how that was accomplished. We're simply not asking for a continuance on that basis.

The trial court responded, "[a]s I understand it, I think we have to proceed with the paternity action first so if there's not a request for a continuance, I need to go ahead and let [counsel for J.M.S.] present her proof on the paternity action." Thereafter, the trial court consolidated the parentage action with the adoption and termination of parental rights action without objection from J.A.P. and C.L.P. Then the trial court took testimony from K.M.F. and J.M.S., both of whom testified unequivocally that J.M.S. was S.M.F.'s biological father. Based on this evidence, the trial court declared J.M.S. to be S.M.F.'s biological father, reserved the issues of custody and child support for a later date, and turned to consideration of the adoption and termination petition.

Following two days of testimony, the parties' lawyers agreed to present their closing arguments in writing and to prepare written proposed findings of fact and conclusions of law. In a letter order filed January 6, 2004, the trial court noted that J.A.P. and C.L.P. "appear to have very

noble intentions with regard to the minor child," and that "there is no evidence that they have failed properly to care for the child, or that their home is inappropriate." Nevertheless, the court concluded that "the proof is overwhelming in its demonstration of the lack of intention of the biological father to surrender his rights," and that it could not "find by the legal standard required that termination of parental rights is proper." The court also noted that "[b]oth parties have referenced statutory provisions emphasizing four month time periods" but concluded that "it is more proper to consider the entire time period from that immediately prior to the birth of the child, and continuing even during the pendency of the action." The trial court held "that the extremely arduous burden of proof which the law requires [J.A.P. and C.L.P.] to carry has not been met, and it is thus our duty to deny the petition for termination of parental rights of the biological father." The trial court did, however, grant J.A.P.'s and C.L.P.'s petition to terminate L.B.B.'s parental rights.[3] On February 12, 2004, the trial court entered an order incorporating the letter opinion and all but three of the findings of fact and conclusions of law proposed by the parties.

The trial court subsequently denied a motion by J.M.S. for custody of S.M.F. but entered orders allowing him reasonable visitation with the child. On March 30, 2004, the trial court entered an order granting J.A.P.'s and C.L.P.'s motion for permission to pursue an interlocutory appeal under Tenn. R. App. P. 9. On April 21, 2004, this court granted the application for permission to pursue an interlocutory appeal under Tenn. R. App. P. 9, set an expedited briefing schedule, and stayed the trial court's visitation order pending resolution of the interlocutory appeal.

## II.
### TERMINATION PURSUANT TO TENN. CODE ANN. § 36-1-113(g)(9)

J.A.P. and C.L.P. first assert that the trial court erred by declining to terminate J.M.S.'s parental rights under Tenn. Code Ann. § 36-1-113(g)(9). Relying on a 2003 amendment to the statute, they assert that the less exacting grounds in Tenn. Code Ann. § 36-1-113(g)(9) apply to J.M.S. because he was not S.M.F.'s "legal parent" when they filed their adoption petition. We have determined that the 2003 amendment is not applicable to this case.

The Tennessee General Assembly rewrote the statutes governing termination of parental rights and adoptions in 1995.[4] These revisions reflected the General Assembly's desire to provide a heightened level of protection to a "legal parent" facing the termination of his or her parental rights as opposed to others claiming to have some legally protectable relationship with a child. *Jones v. Garrett*, 92 S.W.3d at 839. The termination of a legal parent's rights must be based on one or more of the grounds contained in Tenn. Code Ann. § 36-1-113(g)(1)-(8). However, the rights of any other person may also be terminated on one or more of the grounds in Tenn. Code Ann. § 36-1-113(g)(9), which are less difficult to prove.

For the purpose of the termination statutes, a "legal parent" includes a child's biological mother, the biological mother's husband under certain circumstances, or an adoptive parent. It also includes the child's biological father if he "has been adjudicated to be the legal father of a child by

---

[3]L.B.B. has not sought to appeal the trial court's order terminating his parental rights.

[4]Act of May 26, 1995, ch. 532, 1995 Tenn. Pub. Acts 952.

any court or administrative body of this state or any other state or territory or foreign country." Tenn. Code Ann. § 36-1-102(28)(D). Thus, the pivotal question is whether the person whose parental rights are subject to termination is a "legal parent" or instead is among the class of persons against whom the grounds in Tenn. Code Ann. § 36-1-113(g)(9) may be asserted. *In re S.M.*, ___ S.W.3d ___, ___, 2004 WL 66685, at *4 (Tenn. Ct. App. Jan. 15, 2004), *perm. app. denied* (Tenn. Oct. 4, 2004).

Pinpointing how and when to determine whether a biological father is a "legal parent" has proved to be elusive when a biological father's petition to establish parentage and a petition to terminate his parental rights are pending and unresolved at the same time. In 2002, the Tennessee Supreme Court, interpreting Tenn. Code Ann. § 36-1-113(g)(9)(A) as it existed at the time, held that the courts must first address the parentage petition before addressing the termination petition. *Jones v. Garrett*, 92 S.W.3d at 839. If the court confirms the biological father's parentage, then the biological father is a "legal parent" for the purpose of the termination proceeding, and his parental rights cannot be terminated under Tenn. Code Ann. § 36-1-113(g)(9) because that provision applies "only to cases in which no legal relationship between the parent and child has been established." *Jones v. Garrett*, 92 S.W.3d at 836.

In 2003, the General Assembly responded to the holding of *Jones v. Garrett* by amending Tenn. Code Ann. § 36-1-113(g)(9)(A).[5] The purpose of the amendment was to exclude from the class of persons entitled to claim "legal parent" status in termination proceedings those biological fathers who had not already been adjudicated to be the child's legal parent when either the termination petition or adoption petition was filed. As the Tennessee Supreme Court recently explained, "[t]he consequence of this amendment is that there now exists statutory authority to apply the additional grounds for termination enumerated in section 36-1-113(g)(9)(A) to persons who have established legal parentage, but did so subsequently to the filing of a petition seeking termination of their parental rights." *In re D.A.H.*, 142 S.W.3d 267, 272-73 (Tenn. 2004).[6]

J.A.P. and C.L.P. assert on this appeal that Tenn. Code Ann. § 36-1-113(g)(9)(A), as amended in 2003, applies to this case because the amendment became effective on June 2, 2003, long before the entry of the February 12, 2004 order establishing J.M.S.'s parentage of S.M.F. This argument is not well-taken. The proper application of the 2003 amendment depends on when the

---

[5]Act of May 15, 2003, ch. 231, § 10, 2003 Tenn. Pub. Acts 392, 393. As amended, the statute currently reads, in part:

> The parental rights of any person who, *at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child*, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds . . . .
> (emphasis added).

Tenn. Code Ann. § 36-1-113(g)(9)(A).

[6]The Tennessee Supreme Court did not address the constitutionality of the amendment allowing for the termination of the parental rights of legal parents on the basis of the additional grounds contained in Tenn. Code Ann. § 36-1-113(g)(9)(A). *In re D.A.H.*, 142 S.W.3d at 274-75.

acts alleged in the termination petition occurred, not the date on which the order establishing parentage was filed.

Article I, Section 20 of the Tennessee Constitution prohibits the retrospective application of laws when doing so will impair vested rights. *Doe v. Sundquist*, 2 S.W.3d 919, 923 (Tenn. 1999); *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 186 (Tenn. Ct. App. 2000). A vested right is one "which it is proper for the state to recognize and protect and of which [an] individual could not be deprived arbitrarily without injustice." *Morris v. Gross*, 572 S.W.2d 902, 905 (Tenn. 1978).

When S.M.F. was born, J.M.S., her biological father, possessed a fundamental, constitutionally protected right to develop a parental relationship with her even though he was not married to her mother. *Jones v. Garrett*, 92 S.W.3d at 840; *Hawk v. Hawk*, 855 S.W.2d 573, 582 (Tenn. 1993). Whether J.M.S.'s actions or inactions later provided a basis for terminating his parental rights must be determined using the legal standards in existence when the conduct at issue occurred rather than legal standards devised after the fact. Applying the grounds for termination in the 2003 amendment to Tenn. Code Ann. § 36-1-113(g)(9)(A) to J.M.S.'s pre-2003 conduct would impair J.M.S.'s vested rights. *In re D.A.H.*, 142 S.W.3d at 274 (declining to apply the 2003 amendments to Tenn. Code Ann. § 36-1-113(g)(9)(A) retroactively). Accordingly, the trial court did not err by refusing to apply the amended version of Tenn. Code Ann. § 36-1-113(g)(9)(A) retroactively to deprive J.M.S. of his parental rights.[7]

## III.
### ABANDONMENT UNDER TENN. CODE ANN. § 36-1-113(g)(1)

J.A.P. and C.L.P. also assert that the trial court erred by declining to terminate J.M.S.'s parental rights in accordance with Tenn. Code Ann. § 36-1-113(g)(1). They insist that they presented clear and convincing evidence that J.M.S. willfully failed to visit and support S.M.F. from the date of her birth to the date of the trial. Like the trial court, we have determined that J.M.S.'s failure either to support or visit S.M.F. was not willful. Rather, it was the result of the concerted efforts of K.M.F. and her family to interfere with J.M.S.'s reasonable efforts to establish his parentage and to begin to develop a parental relationship with S.M.F.

### A.

---

[7]The record suggests two additional grounds for concluding that J.M.S. was a "legal parent" by the time the trial court took up the termination petition. First, a "legal parent" is a person who has been "adjudicated to be the legal father of the child by any court or administrative body of this state." Tenn. Code Ann. § 36-1-102(28)(D). The statute does not require that this "adjudication" take the form of a written, final order. The trial court's finding announced in open court on March 4, 2003 that J.M.S. was S.M.F.'s biological father constituted an adjudication establishing J.M.S. as S.M.F.'s legal parent. Second, a legal parent is also a "man . . . who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 and 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, *or who has signed such a sworn acknowledgment pursuant to the law of any other state*, territory, or foreign country." Tenn. Code Ann. § 36-1-102(28)(D) (emphasis added). The form J.M.S. filed with the Ohio Putative Father Registry on November 28, 2001 appears to meet these requirements. The form is notarized, and in it, J.M.S. acknowledged that he was the father of the baby. There is no evidence in the record that he ever attempted to revoke this acknowledgment. Thus, although this theory was not briefed by the parties, J.M.S. may have been a "legal parent" for purposes of the termination of parental rights statutes as early as November 28, 2001, the day before J.A.P. and C.L.P. filed their petition to terminate his parental rights.

Persons seeking to terminate a biological father's parental rights on the ground of abandonment under Tenn. Code Ann. § 36-1-113(g)(1) must prove by clear and convincing evidence that the biological father willfully failed either to visit or to support the child. Tenn. Code Ann. § 36-1-102(1)(A), (D)-(E); *In re D.L.B.*, 118 S.W.3d 360, 366-67 (Tenn. 2003). Thus, the concept of "willfulness" is at the core of the statutory definition of abandonment. Because the word "willfulness" and its derivatives can have many meanings, the most appropriate meaning of the word depends on the statutory context in which it is used. *See United States v. Sanchez-Corcino,* 85 F.3d 549, 552-53 (11th Cir.1996); George W. Patton, *A Textbook on Jurisprudence* 313 n. 2 (4th ed.1972) (suggesting that use of the word should be avoided because of its ambiguities).

This court has already had occasion to construe the term "willfully" in the context of the abandonment ground in Tenn. Code Ann. § 36-1-113(g)(1). We held that:

> "Willfulness" does not require the same standard of culpability required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support. A biological parent's willful failure to support or visit is not excused by a custodial parent's or third party's conduct unless the conduct either actually prevents the parent from performing his or her duty to support or visit, or amounts to a significant restraint or interference with the parent's efforts to support or develop a relationship with his or her child. Thus, attempts by others to frustrate or impede a parent's visitation do not necessarily provide a justification for failing to financially support a child.
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (No Tenn. R. App. P. 11 application filed) (citations and footnotes omitted). Although *In re Adoption of Muir* is unreported, its analysis of "willfulness" has been employed in other cases. *See e.g., In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004); *In re A.M.T.*, No. M2003-02926-COA-R3-PT, 2004 WL 1488573, at *6 (Tenn. Ct. App. July 2, 2004), *perm. app.*

*denied* (Tenn. Oct. 4, 2004); *In re J.J.C.*, No. W2002-01400-COA-R3-JV, 2004 WL 115165, at *6 (Tenn. Ct. App. Jan. 23, 2004), *perm. app. denied* (Tenn. May 10, 2004).

Not all attempts by others to frustrate or impede a biological parent's access to a child will provide justification for failing to support a child financially or to visit a child. *Bateman v. Futch*, 501 S.E.2d 615, 617 (Ga. Ct. App. 1998); *In re Leitch*, 732 So. 2d 632, 636 n.5 (La. Ct. App. 1999). However, the courts have found that the following types of conduct may constitute significant restraint or interference with a parent's efforts to support or develop a relationship with a child: (1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child. *In re S.A.B.*, 735 So.2d 523, 524 (Fla. Dist. Ct. App.1999); *In re Adoption of Children by G.P.B., Jr.*, 736 A.2d 1277, 1282 (N.J.1999); *Panter v. Ash*, 1028, 1031 (Or. Ct. App. 2001).

**B.**

J.M.S. did not "willfully" fail to visit or support S.M.F. in the four months immediately preceding the filing of the petition for adoption and termination of his parental rights – from July 29, 2001 through November 29, 2001. The trial court found, and the record on appeal supports, that J.M.S. did not receive notice of K.M.F.'s pregnancy or her belief that he was the child's father until September 6, 2001. Thus, as a matter of pure logic, J.M.S. could not have "willfully" failed to visit or support the baby for four consecutive months immediately preceding the filing of the petition for adoption and termination of his parental rights. He did not know that K.M.F. was pregnant or that she claimed that he was the father of the baby for most of this period.

The same result obtains with respect to J.A.P.'s and C.L.P.'s argument that J.M.S. "willfully" failed to visit or make reasonable payments toward the support of S.M.F.'s mother during the four months preceding the child's birth – from July 2, 2001 through November 2, 2001. As noted above, J.M.S. did not have notice of K.M.F.'s pregnancy and her claim that he was the father of the child until he received her letter on September 6, 2001. Thus, J.M.S. could not have "willfully" failed to visit or make reasonable support payments during the four months preceding S.M.F.'s birth because he did not know of the pregnancy and the claim that he was the baby's father for much of that period.

Moreover, J.M.S.'s conduct during the relatively short time before S.M.F.'s birth and the filing of the petition for adoption and termination of parental rights, as well as the conduct of K.M.F., J.A.P., and C.L.P., militate against a finding that J.M.S. "willfully" abandoned S.M.F. Although J.M.S. knew on September 6, 2001 that K.M.F. was pregnant and that she claimed he was the father of the baby, J.M.S. had no way of knowing for sure whether the baby was actually his. K.M.F. was still married to another man at the time, and she had been sexually active with other men both before and after her relationship with J.M.S. In addition, it had been approximately five months since J.M.S.'s last sexual encounter with K.M.F., and K.M.F. did not tell J.M.S. when the baby was due. As a result, J.M.S. had ample reason to question whether he was, in fact, the father of K.M.F.'s baby.

J.M.S. set out to resolve this uncertainty by sending word to K.M.F. that he wanted to know when the baby was born and that he was interested in obtaining genetic testing to confirm the child's parentage. Neither K.M.F. nor J.A.P. and C.L.P. informed him of the baby's expected due date. In fact, they neglected to inform J.M.S. that the baby had been born or that K.M.F. had decided to permit out-of-state relatives to adopt the child. Instead, as soon as J.A.P. and C.L.P. learned that J.M.S. had initiated genetic testing in Ohio, they left the Versailles area, stayed at various hotels in Ohio until the formal surrender process was completed, and then left the state immediately for Tennessee. In the meantime, J.M.S. hired an Ohio attorney to protect his parental rights and registered with the Ohio Putative Father Registry. All of this occurred prior to the filing of the petition for adoption and termination of J.M.S.'s parental rights. Accordingly, the trial court did not err in concluding that J.A.P. and C.L.P. failed to prove by clear and convincing evidence that J.M.S. had abandoned S.M.F. either by willfully failing to support her financially or by willfully refusing to visit her.

Finally, we note that the trial court, in deciding whether J.M.S. abandoned S.M.F., did not confine itself to consideration of his conduct during the four-month periods immediately preceding the filing of the petition for adoption and termination and S.M.F.'s birth. In doing so, the trial court deviated from the statutory definition of "abandonment" contained in Tenn. Code Ann. § 36-1-102(1)(A)(i) and (iii). In Tennessee, the grounds for terminating parental rights are governed solely by statute, and Tenn. Code Ann. § 36-1-102(1)(G) specifically provides that "abandonment" does "not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition." Thus, the trial court erred to the extent that it based its decision regarding abandonment on J.M.S.'s conduct occurring after the conclusion of the statutory four-month periods. Nevertheless, because we have concluded based on our own independent review of the record that J.A.P. and C.L.P. failed to prove by clear and convincing evidence the elements of abandonment, we affirm the trial court's decision.[8]

## IV.

We affirm the order denying the petition to terminate J.M.S.'s parental rights, vacate our April 21, 2004 order staying the trial court's visitation order, and remand the case for further proceedings consistent with this opinion. We tax the costs of this appeal, jointly and severally, to J.A.P. and C.L.P. and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[8]The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result. *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *First Am. Trust Co. v. Franklin-Murray Dev. Co.*, 59 S.W.3d 135, 142 n.10 (Tenn. Ct. App. 2001); *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 789 (Tenn. Ct. App. 1999); *Allen v. National Bank of Newport*, 839 S.W.2d 763, 765 (Tenn. Ct. App. 1992).